## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GAIL DINES,

      Plaintiff,                             CASE NO. 1:16-cv-11876-GAO

v.

WHEELOCK COLLEGE, a corporation,
JACKIE JENKINS-SCOTT, in her official and
individual capacities, KATHERINE S. TAYLOR,
in her official and individual capacities, and
KINGSTON BAY GROUP, a limited liability
corporation,

      Defendants.

_____/

### AFFIDAVIT OF ANN OLIVARIUS

ANN OLIVARIUS, being duly sworn, deposes and says:

      1.      I submit this Affidavit in support of Plaintiff's motion for leave to file a reply to the Opposition of Defendants Wheelock College, Jackie Jenkins-Scott, David Chard and Katherine S. Taylor (collectively, "Wheelock Defendants") to Plaintiff's Motion to admit me to practice before this Court *pro hac vice.* The evidence set out in this Affidavit is based on my personal knowledge.

      2.      I apologize to the court for the length of this affidavit and supporting materials, but as Wheelock Defendants are attacking my professional reputation, I have no choice but to respond thoroughly. I believe they are plucking out isolated and decontextualized bits of information from a 30-year career, knowing these pieces do not add up to a basis for denying *pro hac vice* status under Local Rule 83.5.3, but still hoping some of the mud sticks. In some

cases, they take bits of material out of public records which, out of context, appear to make a case against me, but conceal other material in those same records that prove I was an effective, resourceful and wholly ethical lawyer in the face of formidable opponents.  They ignore judicial decisions that decisively resolved in my favor matters they present as not yet settled.  I believe some of Wheelock Defendants' efforts to attack my reputation go beyond the bounds of proper advocacy, and actively mislead this Court.

**Background: qualifications and work experience**

3.      I am a Partner and Chair of McAllister Olivarius, a law firm that I founded in 1996.  I am based at our offices at The Pearce Building, West Street, Maidenhead, Berkshire SL6 1RL, England.  I am admitted to practice law and in good standing in every jurisdiction where I have been admitted, specifically Virginia, the District of Columbia, New York, New Hampshire, Minnesota, Idaho, and England and Wales.

4.      I graduated *summa cum laude* from Yale College in 1977.  During my time there, I founded the Undergraduate Women's Caucus and was pivotal in opening Yale's famous watering hole, Mory's, to women by taking action against its liquor license.  I worked on lawsuits that opened the doors to both sexes to work in Connecticut's prisons.  I was asked by the Yale Corporation (its Board of Trustees) to draft a Report on the Status of Women at Yale, eight years after women were first admitted as undergraduates, and when I presented it to the Corporation I employed the term "date rape" which thereafter spread into the national lexicon.  I also authored the first guide to women's health and sex at Yale.  After graduating, I worked with a team of midwives in Manila, Philippines, delivering babies in poor parts of the city.  I attended Oxford University as a Rhodes Scholar and obtained a doctorate in Economics, winning the Nuffield Prize for the quality of my work, and receiving an American

Association of University Women (AAUW) Fellowship to support my final year of research. In 1986, I graduated from Yale Law School and the Yale School of Management, completing what is normally a five-year course in three years, with highest honors.  I was offered a Supreme Court clerkship by Justice Brennan.

5.      I was a plaintiff in the first case to hold that sexual harassment of students by professors at a federally funded university was a violation of Title IX, *Alexander v. Yale*, 459 F. Supp. 1 (D. Conn. 1977), *aff'd* 631 F.2d 178 (2d Cir. 1980).  In 1992, I received the Maria Miller Stewart Legal Challenge Award from the Connecticut Women's Education and Legal Fund for my work on this case.  In 2012, the American Civil Liberties Union selected me for inclusion on its list of the "Nine Most Influential Actors in the History of Title IX."[1]  I have a substantial Title IX practice and believe it is fair to include me among the country's leading Title IX lawyers.

6.      I have advised Queen Rania of Jordan on how to expand rights for women in the Jordanian constitution.  While living in Washington in the 1990s, I worked on behalf of a young Jamaican man to change the policy of the U.S. Navy to allow acceptance of recruits from friendly foreign countries who had been educated in the United States, lobbying multiple officials, particularly the Secretary of the Navy.  This successful policy change was known as the "Mills exception," in honor of my client, and, because of it, many foreigners have become able to serve in the U.S. military and to gain U.S. citizenship.

7.      In my career I have done both finance/corporate-oriented work, and work to fight discrimination and advance human rights.

---

[1] ACLU, *A look at nine people who have shaped Title IX and educational equality over the past 40 years* available at https://www.aclu.org/title-ix-nine.

8.     At Goldman Sachs ("Goldman"), John Thornton, then head of Goldman Sachs in Europe, awarded me the "Best in Finance" prize over several hundred other associates. As a doctoral student at Oxford, I drafted London's International Arbitration Rules, which are still in use in modified form. As a lawyer in private practice, I drafted model software licensing rules for Perot Systems Corporation that are still in use throughout the industry in modified form. My work designing and implementing Perot Systems' corporate structure in Europe from 1988-1990 set the framework for its startling international growth, allowing Perot Systems to employ more than 23,000 people worldwide and generating $2.8 billion revenue annually by the time Dell acquired the company for $3.9 billion in 1999. I also drafted a strategy that Ross Perot considered in designing his bid for the U.S. presidency.

9.     I worked in Shearman and Sterling's Washington office, where I ran its corporate practice, and advised the government of Mexico in the negotiations that led to the North American Free Trade Agreement (NAFTA). I advised the Board of Survival Technology, Inc., maker of the Epi-Pen, about its corporate structure, growth opportunities and possible acquisitions. I advised Dan Case, CEO of Hambrecht & Quist, on the $1.35 billion sale of the firm to Chase Manhattan bank, and on the structure of the foundation he established, Accelerate Brain Cancer Cure (ABC[2]). My legal work on behalf of the Sarnoff Endowment for Cardiovascular Science ensured that this foundation and its $35 million endowment survived against formidable opposition, and was able to continue to promote crucial heart research.

10.    In 1999, I established the London office of McAllister Olivarius, an international firm that does corporate work and litigation for both US and UK clients.

11.     In London, I led the legal team in the purchase and forward management of the Savoy Theatre in London, and devised innovative multinational tax plans to promote the work of an international foundation being planned by the same client.  For an otherwise penniless widow, I located and secured the hidden assets of her husband, a former SS officer, in multiple countries.  I advised and wrote speeches for Baroness Park of Monmouth – who, before her elevation to the House of Lords, had once been the most senior woman in the British Secret Intelligence Service (MI6) – on topics including Northern Ireland, British charity law, how to involve women in international peace initiatives, and her legal rights to publish memoirs of her secret work.  Former Prime Minister Margaret Thatcher and Chancellor of the Exchequer Geoffrey Howe sought (but ignored) my advice on the funding system for British higher education, and on investing in projects designed to advance women and girls.

12.     My firm also specializes in advancing women's rights at work and at universities, and in fighting harassment on the Internet.  I have advised Cambridge University on its sexual harassment/sexual assault policies, and am expanding our practice area to advise companies on investment with a "gender lens," which recognizes that companies with substantial numbers of women leaders have been shown to perform better in the marketplace.

13.     Under my leadership, the UK based headquarters of my firm has received "Lexcel" accreditation for the high quality of its internal management and client care each year since 2011, and was described by its Lexcel assessor as being in the top 2.5% of all English law firms in these areas.  *See* Letter of John Murphy, July 8, 2013 (Exh. 1).  In 2014, the firm was put on the national shortlist for the Excellence Award in Practice Management given by the Law Society of England and Wales, an organization comparable to the American

Bar Association.  *See* Email from Alaryse Johnstone, Law Society, to McAllister Olivarius, August 6, 2014 (Exh. 2).

14.     In 2011, I founded AO Advocates, a firm that works on behalf of survivors of child sexual abuse against institutions, such as boarding schools and churches, that failed to properly safeguard children in their care,.  In 2015, the firm brought and won, at trial level, the first child abuse case against the Jehovah's Witnesses in the UK, making new law which extends the vicarious liability of religious institutions for child abuse committed by their low-ranking officials. *A v Watchtower Bible and Tract Society (Trustees of) & Ors* [2015] EWHC 1722 (QB).  This decision was upheld on appeal.  AO Advocates is now the leading firm in the UK for cases of abuse by Jehovah's Witnesses.

15.     In 2014 and 2015, I was deeply involved in convincing the British Parliament to pass a law criminalizing revenge pornography.  The new law went into force on April 13, 2015.  Since then I have been actively seeking to strengthen and improve this law, as well as U.S. federal and state laws in this area.  My client, Chrissy Chambers, has become a national spokeswoman on this topic and was recently cited in an op-ed by Hillary Clinton.

16.     I advised Nelson Mandela after the International Criminal Tribunal for Rwanda prosecuted Jean-Paul Akayesu, a mayor in Rwanda, for human rights crimes he committed during the Rwandan genocide in 1994, which contributed to Mandela's adding his voice to the idea that rape is a war crime.  I also advised him on the structuring of "The Elders," a group of former world leaders established to promote peace and human rights.  On February 1, 2003, he introduced me to a gathering of dignitaries and Rhodes Scholars in South Africa as "a lawyer who has advised me well and who has courageously advanced the cause of justice, and

improved life opportunities, for hundreds of millions of women, blacks and disadvantaged, worldwide."

17.     I am the founder and chair of the Rhodes Project, a charity and scholarly inquiry into the career paths and life choices of Rhodes Scholars, and am a member of the board of Women Moving Millions, which organizes financially resourced men and women to give $1 million or more to philanthropy benefiting women and girls.  I am the founder of GenerationNext! charity, which through funds earned by my law firm and otherwise, and combined with a donation to the Kay Mason Foundation, has educated over 500 impoverished South African children, including many AIDS orphans.  For six years, I served as a Board member and legal advisor to Autistica - the leading British charity investigating the causes of autism - securing the creation of a Brain Bank at the University of Oxford which became globally significant when Harvard University's equivalent facility suffered a failure in its primary and backup electrical systems that destroyed more than half of its samples. I also served on the Board of OpenDemocracy USA, a "digital commons" which seeks to promote international intellectual dialogue and human rights.  I have just been named a Donaldson Fellow by the Yale School of Management, an honor given to its alumni based on our careers, which in my case has sought to combine excellence in corporate advisory work with feminist and human rights activism, a business model that seeks to "do well by doing good."

**New York bar application**

18.     In 2008, 18 years after I was first admitted to practice law in Virginia, I decided to apply to the bars of additional states to be able to accommodate a broader range of cases.  My first application was to New York.  By mistake, my husband and law partner, John F.O. (Jef) McAllister, submitted an incomplete draft application when I was out of the

country.  The draft application omitted a list of litigations in which I had been involved as a plaintiff or defendant.  It was reviewed and passed in New York and I was admitted normally in 2008.  I submitted applications to other states – Minnesota, New Hampshire and Idaho – shortly after applying to New York.  These applications were directly supervised by me, included the litigation list, and were found at the time of submission, and subsequently by the bar authorities of those states to be full and complete.

19.     Two years later, the New York bar authorities reexamined my application, found that the litigation list was absent, and began an investigation which culminated in the decision of the Appellate Division of the Third Judicial Department on April 5, 2012 (the "First New York Order") (Exh. 3).

20.     I take full responsibility for the shortcomings of my application.  It was my application and I fully agree that I deserved to be sanctioned for the mistakes that landed a draft application with the New York bar authorities.

21.     As invited to do by the First New York Order, I then submitted a complete application.  It detailed every possible controversial aspect of my career and included all court decisions concerning me as well as the complete record of the proceedings that led to the First New York Order.  I was then interviewed at length by the Committee on Character and Fitness of the Third Judicial Department about my entire career, including my termination by Goldman Sachs and subsequent discussions with the U.S. Attorney's office, and termination and subsequent litigation against the Sarnoff Endowment.  The Committee also examined the letter from Judge Patel submitted here by Wheelock Defendants, and discussed it with me. This letter is explained in more detail below.  The Committee on Character and Fitness were welcoming and positive during the interview and then issued a report recommending my

readmission.  The Appellate Division so ordered on May 9, 2013 (the "Second New York Order").  (Exh. 4.)  I was readmitted in New York on May 29, 2013.  The New York good standing certificate issued upon my readmission is attached here as Exh. 5.

22.     Meanwhile, before the Second New York Order restoring me to full status was issued, the First New York Order action had automatically triggered reciprocal discipline in the five other jurisdictions where I was licensed.  I have never faced any discipline in any jurisdiction except for the First New York Order, which led to reciprocal actions in other jurisdictions where I am licensed.

23.     On the date of the First New York Order, I was licensed in the states of New Hampshire, Minnesota, Virginia, and the District of Columbia, and as a solicitor of the Senior Courts of England and Wales.

24.     New Hampshire reviewed my application to that state in light of the First New York Order and concluded within five weeks that there were no grounds to proceed against me, and I remained in good standing in that state.  *See* Letter of Thomas Trevethick, Deputy General Counsel, New Hampshire Supreme Court Attorney Discipline Office, May 10, 2012, Exh. 6.  Minnesota reached the same conclusion.  *See* Martin A. Cole, Director of the Minnesota Office of Lawyers Professional Responsibility, "Determination That Discipline is Not Warranted" dated October 16, 2012, Exh. 7.  The Solicitors Regulation Authority of England and Wales made a similar determination.  *See* Letter from Stephanie Barry, Solicitors Regulation Authority, August 23, 2012, Exh. 8.

25.     Virginia determined that the unusual nature of the New York discipline meant there was no Virginia equivalent, making reciprocal disciplinary proceedings inapposite. Virginia thus opened its own independent investigation into the same allegations considered

in New York.  It decided upon a Private Admonition Without Terms, which is not public discipline.

26.     Under its precedents, the District of Columbia believed that reciprocal discipline was the proper procedure, and thus imposed its customary temporary suspension of my license pending the resolution of the reciprocal proceeding.  The case took 18 months to determine.  At the end of this proceeding, the D.C. Court of Appeals, by an Order dated May 15, 2014, decided to suspend me retroactively only for that 18-month period, on the grounds that this was the best available analogy to the temporary discipline New York had imposed.  This decision is attached as Exh. 9.  The Court also directed my immediate readmission once I certified that I had completed the standard ethics course required of all new D.C. attorneys.  I attended that course two days later, and the Court issued an order confirming my reinstatement on June 3, 2014, attached as Exh. 10.

27.     As of the date of the First New York Order, I had been admitted in Idaho but not yet sworn in.  With Idaho's permission, I put my application on hold until matters in New York and the reciprocal jurisdictions were settled.  I renewed my application in 2015.  Idaho admitted me on May 27, 2015, Exh. 11, as did the U.S. District Court for the District of Idaho. I have also been readmitted to the U.S. District Court in Minnesota (Exh. 12) and, after litigation opponents moved to deny my *pro hac vice* admission in the Southern District of Florida citing many of the same arguments made by Wheelock Defendants here, I was admitted there last year.  See Order of Judge Ursula Ungaro dated November 5, 2015.  Exh. 13.

28.     Each state in which I have been admitted has extensively reviewed my record in light of the First New York Order.  Outside of D.C.'s limited retroactive suspension – after

which I was granted immediate readmission – every state to which I am admitted chose to take no action that would impede my ability to practice law.    Indeed, New York itself readmitted me on a "lightning track," with Mr. Gaynor, the Deputy Chief Attorney of the Committee on Professional Standards who prosecuted the case against me, describing me as "an accomplished attorney in all respects" in the hearing before the Referee.

**Patel Letter**

29.    In 1986-87 I was a law clerk to Marilyn Hall Patel, a U.S. District Judge in San Francisco.    The term of the clerkship was one year.    I left it a few weeks early, with the Judge's agreement, to take up my next job at Goldman Sachs in New York.    I considered the clerkship to be an excellent year; the judge relied on my work, and my draft opinions and orders for her were seldom altered.    I cleaned the large backlog of cases I inherited from my predecessor.    Judge Patel and I got along well.    She threw a baby shower for me, invited my nephew to live with her son for six weeks just before my departure, her son spent overnights at my house, and she gave a leaving party at which there were hugs and tears.    I learned a great deal and felt fortunate to have worked for her.

30.    In December 1987, four months after my departure, the judge wrote me the angry letter which has been submitted by Wheelock Defendants, criticizing my performance during the clerkship, which I was stunned to receive.    See. Doc. 26-6.    She had never criticized my performance during my employment, and, in fact, had said only positive things about my work during that year.

31.    In a contest between a federal judge and a clerk, it is difficult for the clerk to appear to be anything but wrong, and, indeed presumptuous even to suggest that the judge's actions might be imperfect.

32.     Almost 30 years have passed since Judge Patel's letter; I am 61, Judge Patel is over 70.   We had an unusually intense personal relationship during the clerkship year, which was a tumultuous one for her due to the return to her life of an adult son she had given up for adoption 20 years previously, and which she contrasted with the easier path of my own marriage and motherhood (my first child was born during the clerkship year).   I was frequently a close confidante, but she was complex and would sometimes freeze me out.   She had asked me to stay for a second year, which I declined.

33.     It seems quite remarkable for the Wheelock Defendants to attack my reputation by using Judge Patel's letter, which is not connected to any matter currently before the Court. However, for the Court's information, and to give a slightly fuller picture of my clerkship year, I attach a letter written by my co-clerk (Exh.14).

34.     The Character and Fitness Committee of the New York Bar had Judge Patel's letter and substantial other materials relating to my clerkship year when it examined my reapplication in 2013.   These included additional correspondence between her and me which show more of our relationship, including its kinder side, which Wheelock Defendants have chosen to ignore in their selective invasion of the private correspondence of both the judge and me.   Judge Patel also provided the Committee with an affidavit covering my period of employment as her clerk.   The Committee concluded that I was of good character, after which the Appellate Division ordered my readmission in New York.

**Goldman Sachs**

35.     Wheelock Defendants insinuate that I am untrustworthy because of my departure from Goldman Sachs in 1987.   I believe the record demonstrates the opposite, and also demonstrates the bizarre nature of Wheelock Defendants' attempt to pick out whatever

bits of negativity they can find out of my 30-year career out of context, and argue that this gives them more insight into my capacity to practice law before this Court than the bar authorities of the seven jurisdictions that have reviewed the whole of my career and declared me fit to practice.

36.     Goldman was under special scrutiny in 1987, when I started there as a trainee associate in its Mergers and Acquisitions department.  Rudolph Giuliani was U.S. Attorney and was targeting Wall Street firms.  One prominent Goldman partner, Robert Freeman, had recently been arrested on insider trading charges and was led off the trading floor in handcuffs.  Goldman was acutely sensitive about its image.

37.     As part of the Goldman training program, my fellow trainees and I were instructed that our duties would include culling files that had been subpoenaed.  The Goldman manager giving the presentation joked that the boxes often came back "much lighter."  This produced agitation among my colleagues.  During the discussion that ensued, I was asked, as the only law school graduate present, whether this activity was proper.  I was not eager to make trouble at the start of a new job, but ultimately said that removing papers under such circumstances could be an obstruction of justice, depending on the content of the papers and the wording of the subpoena.  When pressed as to whether I would commit such an act, I said I would not obstruct justice.  (My husband told me that night that I could "kiss that job goodbye.")  Shortly thereafter I was accused of expense account fraud and fired, though I had never filled in or signed an expense account.

38.     The $40-$80 per week disputed by Goldman in my expenses was not large for an investment bank.  Several months after terminating me, Goldman paid me a year-end discretionary bonus that was many times greater than the amount it claimed was disputed.  On

what should have been a minor personnel matter, it employed a Sullivan & Cromwell partner to work out its position and to contact Judge Patel, whose disaffection with me dates from this intervention.  I believe that all these circumstances are consistent with Goldman wanting me gone and neutralized for other reasons.  Mike Overlock, its head of Mergers and Acquisitions, told me: "it isn't enough to be the smartest person in the room, you have to show us that you're loyal."

39.     Because I knew the U.S. Attorney's investigation into Goldman was continuing, I reported the circumstances of my firing to it as I believed they were evidence of a corporate culture that prized loyalty to the firm over compliance with the law.  I had several interviews with the Assistant U.S. Attorney in charge, who found the information of interest.  However, because I had not myself obstructed justice or seen others do so, my value as a witness was limited and the U.S. Attorney's Office did not use me as such.[2]

40.     The Character and Fitness Committee of the New York Bar examined my departure from Goldman Sachs when it reviewed my reapplication in 2013.  It concluded that I was of good character, after which the Appellate Division ordered my readmission in New York.  The Idaho Bar also had a full record of these materials when it admitted me in 2015.

**Withdrawal of *Pro Hac Vice* Motion in *Elise R. Lobegeiger v. Celebrity Cruises, Inc. et. al*, Case No. 11-21620-CIV-ALTONAGA/SIMONTON**

41.     Wheelock Defendants attempt to make an issue of my withdrawal from *pro hac vice* status in a Florida federal case in 2012, immediately in the wake of the First New York Order.  For reasons stated below, I believe they are presenting the Court with only the

---

[2] I have on file an affidavit confirming these facts from the Assistant U.S. Attorney I spoke to at the time, which he provided to the New York Bar authorities under their normal strictures of confidentiality.  It can be provided to the Court if required.

"prosecutor's brief" in this story, even though the full record clearly contradicts their argument.  They have chosen *not* to tell this Court that a federal judge has already examined this material thoroughly and resolved it in my favor, a matter of public record well known to them.  In doing so I believe they have stepped beyond the bounds of proper advocacy into fundamentally misleading the Court.

42.     In 2011, I was admitted *pro hac vice* in the Southern District of Florida to serve as lead counsel in the case of *Elise R. Lobegeiger v. Celebrity Cruises, Inc. et. al*, Case No. 11-21620-CIV-ALTONAGA/SIMONTON.  Ms. Lobegeiger's finger had been chopped off by a badly designed deck chair when she was taking a cruise.  The shipboard doctor gave her substandard emergency care, including throwing the severed finger in the garbage, which, over the doctor's objections, Ms. Lobegeiger then retrieved to carry to the hospital during a brief port call in Alaska.  The surgeons were horrified that the finger had not been put on ice or otherwise preserved, and reattached it with strict instructions not to remove the dressing for several days.  Nevertheless, the shipboard doctor insisted on removing the dressing.  Over the course of several months, the reattached finger slowly and painfully got worse, and the reattachment was only partially successful.

43.     I studied Judge Altonaga's previous rulings concerning the liability of cruise ship owners for medical malpractice and the state of the law in the 11th Circuit, and concluded that, given the facts of this case, there was a possibility that she might be open to arguments that would expand shipowner liability.  Based on our advocacy, Judge Altonaga issued a ruling that expanded the vicarious liability of shipowners for doctors employed by them who hold themselves out as agents of the shipowner, and also opened shipowners to punitive

damages for medical malpractice. *See* Judge Altonaga's Order dated August 23, 2011, Exh. 15. This was a significant victory for my client, and for others who would follow.

44.     The Lobegeiger case was in the very final stages of settlement negotiations in March 2012. Due to Judge Altonaga's ruling and other favorable developments achieved through my leadership of the plaintiff's team, the defendants had substantially increased their offer to Ms. Lobegeiger, so that we were now close to settling the case.

45.     On April 5, 2012, the First New York Order was issued revoking my application in New York. My specialist counsel for the New York disciplinary inquiry was Peter V. Coffey, who had then been practicing law for 47 years, and specializing in attorney discipline for 25 years. He had served on the disciplinary committee of the Third Judicial Department in New York (where my case was heard) for six years, and chaired it for one year. *See* Letter of Peter V. Coffey to Hon. Cecilia Altonaga, April 13, 2012. Exh. 16. He considered the ruling revoking my application highly unusual, so its implications for my practice in other states were not obvious and had to be carefully analyzed. At the same time, the imminent death of my mother-in-law meant that both my husband (the managing partner of our firm) and I were absent from our U.K. headquarters when we visited her in Connecticut in the first weeks of April 2012, causing unusual distraction and delays in office business, including in addressing the consequences of the First New York Order. My mother-in-law died on April 15, 2012 and her funeral was the following week.

46.     I had licenses in other jurisdictions besides New York, and it was Mr. Coffey's view that my ability to practice law on the basis of those licenses remained valid unless and until those jurisdictions ruled otherwise. After some days thinking about it, he also advised that the unusual nature of the discipline in New York – revoking my *application* rather than

my license, a peculiarity unique to New York law – meant that other jurisdictions, including the Southern District of Florida, should properly take no action against me until New York had a chance to complete its process by determining whether my reapplication should be accepted, and that I should remain an active lawyer in those other jurisdictions until New York's final determination.

47.     Mr. Coffey's opinion that the First New York Order was so unusual that it had no or little relevance in terms of reciprocal discipline was not a "stretch" position.  It was confirmed by Michael Gaynor, the Deputy Chief Attorney of the Committee on Professional Standards in the Third Judicial Department, who personally handled the New York action against me.   When Richard Slaney, Virginia Bar counsel, asked Mr. Gaynor to explain whether the First New York Order should have reciprocal effect, this was the answer Mr. Slaney recorded in a memorandum to other officials of the Virginia State Bar:

> I had an opportunity today to speak with Michael Gaynor, the Deputy Chief Attorney for the New York Committee on Professional Standards. Essentially, Mr. Gaynor is the equivalent of Bar Counsel in NY and personally handled the matter in regard to Ms. Olivarius. He indicated to me that:
>
> • The order entered by the Court is very unique – in his 13 years with that office he has never seen one like it (a sentiment echoed by Coffey Opinion letter attached; provided by Mr. Rosenfeld).
>
> • The NY Court could have disbarred Ms. Olivarius or suspended her law license, but did neither.
>
> • She may reapply in NY at any time (even immediately) under the terms of the order, and while the application process does not allow for immediate approval, there is no time limit or other impediment to her re-applying.
>
> • He understood the order may not fit as an order meriting reciprocal discipline in VA.

This is excerpted from an email by Richard Slaney to Barbara Lanier, Secretary of the Virginia State Bar, May 16, 2012 (Exh. 17).

17

48.     Given Mr. Coffey's advice and this background, it was not immediately clear to me how I should proceed in the other jurisdictions where I was admitted, including in the Southern District of Florida, where settlement discussions with opposing counsel in the Lobegeiger case were in their very final stages.  Ms. Lobegeiger's engagement with my firm was under New Hampshire law, where I remained in good standing.  Nevertheless, after consulting with Ms. Lobegeiger's local Miami counsel on the proper course of action, I spoke with opposing counsel, who had been informed about the First New York Order by lawyers working for me within hours of its issuance.  I discussed the matter fully with them and told them that I would withdraw from the case, to which they assented, prompting my motion to withdraw on April 13, 2012.  Exh. 18.  However, when it became clear to opposing counsel that, based on Mr. Coffey's advice concerning my other licenses, I intended to complete the few remaining moments of settlement negotiations in order to protect my client, they filed their motion to disqualify me on April 15, 2012.  Exh. 19.  In response, Judge Altonaga (following opposing counsel's false statement that the First New York Order was a disbarment) granted my earlier motion to withdraw on April 16, 2012.  Exh. 20

49.     That same day, I formally wrote the Clerk of the Court about the First New York Order (Exh. 21).

50.     I immediately and fully complied with Judge Altonaga's order and, despite my valid licenses in other states, fully withdrew from the Lobegeiger case, leaving the matter in the hands of my team.  The case settled promptly and at the favorable levels that I had negotiated for Ms. Lobegeiger.

51.     I was faced with a complex circumstance in the wake of the First New York Order, including legal advice from a distinguished practitioner saying I should remain an

active lawyer and that other jurisdictions should not take reciprocal action until the New York reapplication process was complete.  I was not evasive or dishonest, as Wheelock Defendants maintain, but instead was seeking, in conditions of uncertainty, to protect my clients' interests and comply with my differing obligations in the various jurisdictions where I was admitted.

52.     These issues were fully aired last year before Judge Ursula Ungaro in the U.S. District Court for the Southern District of Florida, when defendants in another case brought by my firm, *Monica Morrison v. University of Miami et al.*, No. 1:15-cv-23856, at *3 (S.D. Fla. Nov. 5, 2015), sought a tactical advantage by trying to prevent my *pro hac vice* admission, similar to what Wheelock Defendants seek here.  Judge Ungaro overruled the defendants' objections and admitted me *pro hac vice* to that court.  Exh. 13.  The case has since settled.

53.     The account in ¶¶ 41-51 above of what happened in the *Lobegeiger* case is already in the public record in nearly identical form, because I submitted it to Judge Ungaro's court in an affidavit.  Wheelock Defendants undoubtedly studied it when they prepared their Opposition.  Yet the Opposition is striking in its slalom through that document, managing to avoid its central facts in its quest to disparage me.  The Opposition also neglects to inform this Court about Judge Ungaro's ruling, which is also in the public record.  She is a judge of the U.S. District Court for the Southern District of Florida where the Lobegeiger case was heard. She clearly understands the rules of that Court and the ethical rules applying to Florida attorneys, which Wheelock Defendants confidently assert I violated.  But when Judge Ungaro was presented with an account of my actions in the Lobegeiger case virtually identical to the one being provided in this Affidavit, she promptly admitted me *pro hac vice*. Exh. 13.  I believe her order is clearly relevant to the claims Wheelock Defendants make in the

Opposition, and to the *pro hac vice* determination before this Court, yet Wheelock Defendants saw fit to omit it.  I respectfully suggest they have failed in their duty of candor.

**Prior Allegations of Improper Communications with Represented Parties in Litigation in Other Jurisdictions.**

54.     The Wheelock Defendants make another allegation about my conduct in Florida: that I violated its ethics rules by communicating with a represented party.  That too is false.  And, once more, they have neglected to tell this Court that Judge Ungaro already decided this issue in my favor.

55.     The Wheelock Defendants' claim is that in the *Morrison* case, I breached Florida Rules of Professional Conduct barring contact with witnesses controlled by the defendant.  This is not true, and is not even a close question.  On February 13, 2015, a paralegal working under my direction, Jan Cervenka, contacted Professor Susan Haack, an employee of the University of Miami, to see if she had any information related to the case, as another witness had recommended.  Professor Haack is a philosopher based at the University of Miami Law School, who, as it turned out, had not been an active member of the Philosophy Department (the department of the professor who had harassed the plaintiff) for over ten years.  Professor Haack said she had nothing to offer the case, and Mr. Cervenka reported this to me.  I directed him to not pursue the matter further.

56.     On February 18, 2015 lawyers representing the University of Miami wrote me a letter asserting that this contact was an ethical violation.  Diane Morton, a Florida attorney working for my firm, responded robustly on February 25, 2015 in a "for settlement purposes only" letter, which I will not enclose in order to protect the customary confidentiality and privilege of settlement communications, but which the Court is welcome to see.  It has been settled law in Florida for 20 years that contacts between counsel and employees of defendant

organizations are restricted only for employees with *management responsibility*, permitting contacts with other employees as part of the fact-gathering process.  Mr. Cervenka's contact with Professor Haack as a potential witness was entirely proper.  Indeed, I believe I would have failed my duty to my client had my firm not contacted her.

57.     Judge Ungaro found no ethical violation in this conduct.  After the defendant in the *Morrison* case raised the same baseless criticisms the Wheelock Defendants are raising again here, she granted my *pro hac vice* application.  Exh. 13.

**My Letter to Defendant Katherine S. Taylor, Chair of Wheelock College Board of Trustees dated August 4, 2015.**

58.     The Defendants also claim that I have committed various Massachusetts ethical violations in representing my clients in this case.  Refuting these erroneous claims requires a discussion of various communications between me and my clients.  Insofar as attorney-client matters are revealed by my clients in their affidavits, or by me in this affidavit, I can report to the Court that they have waived their attorney-client privilege only for the limited purpose of responding to Wheelock Defendants' Opposition and for no other purpose, and only to the extent of the contents of their and my affidavits.

59.     Upon instruction to act on behalf of Drs. Gail Dines ("Dr. Dines"), Eric Silverman ("Dr. Silverman") and Joan Gallos ("Dr. Gallos"), I started my review of their cases.  From the outset, I identified an immediate need to deal with Dr. Gallos' employment situation.  She had been unlawfully terminated as Wheelock's Vice President of Academic Affairs ("VPAA") on June 30, 2015 (*See* Complaint ¶185) and had just been moved out of her office at the time of our first meeting.  Wheelock had stopped paying Dr. Gallos her salary and benefits, and was pressuring her to accept unfavorable terms relating to her transition to faculty.  Wheelock did not advise her of her rights as a fully tenured faculty member, offer her

the kind of favorable transition packages given to all other senior administrators returning to their tenured faculty roles during the Jenkins-Scott's presidency, and seemed determined to force her out of the College.  As a result, I wrote to Katherine Taylor, in her capacity as the Chair of Wheelock's Board of Trustees, to notify her that we had been retained as counsel in this matter.  (Doc. 25-1.)

60.     At that point, it was not clear to me that Attorney Hirsch, or his firm, had been retained to deal with the litigation of these potential lawsuits, and based on what Dr. Gallos told me, I thought his retention was highly unlikely for both practical and ethical reasons, to the point of impossibility. See Gallos Aff., ¶ 13.

61.     First, it was my understanding from Dr. Gallos that Attorney Hirsch represented Wheelock on general employment and policy matters only, not litigation matters. Further, I checked his biography on the website of his law firm, Hirsch Roberts & Weinstein, and read that he does not describe himself as a litigator.  Our case was moving to litigation.

62.     Second, Dr. Gallos, as VPAA, was a senior Wheelock administrator before her termination.  She said that Wheelock often used different outside attorneys based on their expertise and felt no special obligation to Attorney Hirsch's firm.  She did not expect Wheelock to choose it in opposing her lawsuit, for several reasons.

63.     According to Dr. Gallos, Attorney Hirsch had been her social friend and also worked as her ally inside Wheelock.  He was uneasy about the way President Jenkins-Scott had been behaving.  He had worked behind the scenes to help neutralize President Jenkins-Scott's irrational hostility and false, if not paranoid, accusations towards Dr. Gallos.  He had also agreed with Dr. Gallos that President Jenkins-Scott was engaging in a campaign of retaliation against Drs. Dines and Silverman and violating faculty due process and academic

freedoms.  Dr. Gallos told me that under these circumstances, she would want to call him as a witness.  In my letter to Attorney Hirsch dated August 13, 2015, I discussed this, saying that he was conflicted in acting on behalf of Wheelock Defendants pursuant to Massachusetts Rules of Professional Conduct Rule 3.7, which states: "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony related to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client."  See Doc.25-3.

64.     Dr. Gallos also told me that, given the concerns Attorney Hirsch had expressed to her about the actions of President Jenkins-Scott, she thought he could not defend Wheelock in a suit brought by her, Dr. Dines or Dr. Silverman.

65.     Thus, I had no belief at the time of writing Katherine Taylor that Mr. Hirsch was Wheelock's counsel for the Dines, Silverman or Gallos matters.  Out of respect for my obligations as a lawyer and adherence to and respect for professional conduct rules, not out of defiance, I wrote to Ms. Taylor so that she could pass my letter to appropriate counsel.

66.     Following Attorney Hirsch's letter dated August 10, 2015 (Doc. 25-2) stating that he would handle for Wheelock all the cases involving my clients, my firm has always sent all communications on these cases to his firm.

67.     I did not promise in my letter of August 10, 2015 not to file a *pro hac vice* motion.  Instead I simply wrote in this letter that Attorney Kathleen Hallisey would deal with the litigation of these lawsuits.  Ms. Hallisey is admitted to the Massachusetts Bar.  She left my firm on June 18, 2016.  Attorney Anita Vadgama joined my firm on April 25, 2016 and was assigned to the Plaintiffs' cases.  Ms. Vadgama is also admitted to the Massachusetts Bar

and admitted to the District Court of Massachusetts, and thus she became the attorney of record for these lawsuits.  The reason I said in 2015 that Ms. Hallisey would deal with the litigation aspects of Plaintiffs' cases was simply to let Mr. Hirsch know that our firm was able to handle the Plaintiffs' claims because it employed appropriately licensed Massachusetts counsel.  Indeed, I wrote him on September 12, 2016 advising him that we were shortly to be filing suits in these matters, to which he responded that he was instructed to accept service. (Exh. 22.)

**My written statement attached to the Sanghavi report**

68.     In March 2016, Drs. Dines and Silverman were informed by President Jenkins-Scott and Board Vice Chair Daniel Terris that an external law firm, the Sanghavi Law Office, would be conducting a "fact finding" investigation into their teaching and alleged student complaints.

69.     When Drs. Dines and Silverman received a final copy of the investigation report (herein referred to as the "Sanghavi report"), not only were they extremely concerned about the falsity of its findings and its retaliatory nature, but also about how widely the Sanghavi report and its untruths would be disseminated.  It was not clear to them where it would be circulated, but based on how President Jenkins-Scott had circulated criticisms of them in the past, they reasonably believed a wide distribution was likely.

70.     Accordingly they were determined to write a rebuttal.  The rebuttal was a major piece of work that included a detailed analysis by Drs. Dines and Silverman of the Sanghavi report's shortcomings, together with a summary of that analysis and substantial supporting appendices.  They wanted to correct the record comprehensively.

71.     As the rebuttal neared completion, Drs. Silverman and Dines decided a short statement by my firm would be a good way to complete it.  They wanted me to pay particular attention to the many failures of due process that were apparent in the way the report had been compiled, which is a topic that lawyers can speak to.  Because Wheelock had chosen to clothe its attack on them in the mantle of the Sanghavi Law Office, they also thought it would help people take their rebuttal seriously if it, too, had the endorsement of a law firm.

72.     I did not consider at all that my brief statement appended to their rebuttal might be, or be construed as, an impermissible contact with represented parties.  I likened it more to a concluding statement at a press conference given by a client, which, of course, the other side in litigation might see, but is not aimed particularly at them.  Thus, the statement I prepared was not written with the intended purpose to communicate with the Board in circumvention of Wheelock Defendants' counsel.  Doc 25-5.

73.     However, I left it to Drs. Silverman and Dines to decide if they would include my statement in their rebuttal, and to whom they would distribute these materials, including who would receive them at Wheelock.  I refer to Dr. Silverman's affidavit regarding the dissemination of the rebuttal, where he says he and Dr. Dines indeed decided to include my statement.

**"Jury Verdicts" Document**

74.     On or around August 11, 2016, Plaintiff Joan Gallos informed me that the new president of Wheelock, David Chard ("President Chard"), had sent an email inviting her to meet with him, without attorneys, to explore possible resolution of her claims. (See Dr. Gallos Aff., ¶15)  He required her to keep the meeting confidential, along the usual lines of settlement talks. Id.

25

75.     Dr. Gallos was extremely distressed by the discrimination and retaliation she was continuing to suffer at the hands of the Wheelock Defendants.  She wanted to be fully prepared for the meeting, hoping it would finally allow a resolution of the dispute without the need to file her lawsuit.

76.     At the request of Drs. Dines, Silverman and Gallos, my legal assistant, Jan Cervenka, prepared a document entitled "Jury Verdicts Informing An Analysis in Joan V. Gallos v. Jackie Jenkins-Scott, David Chard, Individually Named Trustees of Wheelock College and Wheelock College" (the "Jury Verdicts").  (Doc 25-7)  It was derived wholly from public information.  Mr. Cervenka sent this document to Drs. Dines, Silverman and Gallos on August 17, 2016.  Exh. 23.  They wanted to understand fully the risks in filing lawsuits, and noted the urgency in understanding this information as President Chard's overtures to them signaled a possible opening to negotiation.  The heading "for settlement purposes only" was an automatic reflex by Mr. Cervenka reflecting the fact that Drs. Silverman, Dines and Gallos might use the document in settlement talks, but the document was for their use only.  I did not intend for any of them to give it to President Chard in order to circumvent Wheelock's attorneys, nor did I instruct them to do so.

77.     Dr. Gallos told me after her meeting with President Chard that *he* had requested the Jury Verdicts document after she had referred to it, so she gave him her copy. When he expressed interest in the meeting notes she was using, she gave him her copy of those as well.  President Chard also asked her to send all the documents she had brought to the meeting to him in electronic form, which Dr. Gallos did immediately after the meeting.  He made the request, not Dr. Gallos; and it was her decision, not mine, to do what he requested.

**Importance of Plaintiffs having their attorney of choice as attorney of record**

78.     I have worked closely with the Plaintiffs – Drs. Silverman, Dines and Gallos – for 18 months.  Wheelock Defendants has rebuffed all attempts at mediation, cancelling one at the last minute for apparent tactical advantage after my team and I came from England, and appears determined to continue its course of denigrating and dismissing Plaintiffs come what may.  The Wheelock Defendants' "scorched earth" tactics now extend from their treatment of my clients to their Opposition, which makes arguments so contorted and removed from the facts that they extend beyond the lines of ethical advocacy they profess to uphold, evidently hoping to keep me from representing Plaintiffs before this Court, or at the very least to damage my reputation along the way.  The Plaintiffs and I have established, through many vicissitudes, a very close relationship of trust and confidence.  They rely on my counsel, which the Wheelock Defendants, for their own reasons, would prefer them not to have.  I believe I can serve Plaintiffs most effectively if admitted *pro hac vice* to this court.

79.     The exhibits attached hereto to my Affidavit are true and correct copies of the originals.

80.     I declare under the penalties of perjury on this 2nd day of December 2016 that the foregoing is correct and true.

>    /s/ Ann Olivarius     
>
> Dr. Ann Olivarius

## <u>CERTIFICATE OF SERVICE</u>

I, Anita S. Vadgama, hereby certify that the document was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing on this December 2, 2016.

<u>/s/ Anita Vadgama</u>

Anita S. Vadgama