UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GAIL DINES,

    Plaintiff,

v.

WHEELOCK COLLEGE, a corporation,
JACKIE JENKINS-SCOTT, in her official and
individual capacities, KATHERINE TAYLOR,
in her official and individual capacities, and
KINGSTON BAY GROUP, a limited liability
corporation,

    Defendants.

Case No. 1:16-cv-11876-GAO

### AFFIDAVIT OF JOAN V. GALLOS IN SUPPORT OF REPLY TO WHEELOCK DEFENDANTS' OPPOSITION TO MOTION FOR VISITING ATTORNEY *PRO HAC VICE*

JOAN V. GALLOS, being duly sworn, deposes and says:

1. I am the Plaintiff in the lawsuit *Joan V. Gallos v. Wheelock College, Jackie Jenkins-Scott, David Chard and Katherine S. Taylor* (case number: 1:16-cv-11884). Like Dr. Dines, the Plaintiff in the instant case, I am represented by Dr. Ann Olivarius' firm, McAllister Olivarius. My lawsuit is also brought against three of the four defendants in this case. The evidence set out in this Affidavit is based on my personal knowledge.

2. I submit this Affidavit in support of Plaintiff's motion for leave to file a reply to the Opposition of Defendants Wheelock College, Jackie Jenkins-Scott ("President Jenkins-Scott"), and Katherine S. Taylor ("Defendants") to Plaintiff Gail Dines' Motion to admit Dr. Ann Olivarius *pro hac vice*.

3. For the purposes of being able to properly respond to the Wheelock Defendants Opposition to the Motions to Admit Dr. Olivarius *pro hac vice*, I have consented to waive attorney-client privilege. However, this waiver stands only for that purpose and only insofar as it refers to attorney-client communications that are set out below and not in any other respect. I respectfully submit to the Court that all other conversations between my counsel and me are governed by attorney-client privilege and cannot and should not be disclosed.

4. Attached hereto as Exhibit JG 1 is a true and correct copy of an email President Chard sent me on August 11, 2016 at 3:10 PM.

5. Attached hereto as Exhibit JG 2 is a true and correct copy of an email President Chard sent me on August 18, 2016 at 7:12 AM.

6. Attached here to as Exhibit JG 3 is a true and correct copy of a letter President Chard sent me on July 29, 2016.

7. Attached hereto as Exhibit JG 4 is a true and correct copy of an email I sent to President Chard on August 19, 2016 at 5:30 PM.

8. Attached hereto as Exhibit JG 5 is a true and correct copy of an email President Chard sent me on August 25, 2016 at 10:20 PM.

9. At the end of July 2015, I instructed Dr. Olivarius and her firm, McAllister Olivarius, who are specialists in employment discrimination, to take over as my legal counsel with respect to my termination as Wheelock's Vice President of Academic Affairs ("VPAA"). I told Dr. Olivarius that I had previously been represented by two other attorneys (Nancy Shiplesky and Dahlia Rudavsky), and that Attorney Jeffrey Hirsch had been representing Wheelock in negotiations with them. Now that my case was headed toward litigation, however, I

did not think he would be Wheelock's counsel. Indeed, I did not believe it possible that he could be, for several reasons.

10. As VPAA, I had dealt with Attorney Hirsch on numerous occasions, as well as other law firms Wheelock had hired. He provided Wheelock administrators, including President Jenkins-Scott and me, with general HR, policy, and student-related advice. But I never saw him handle litigation for Wheelock, and I did not think the litigation I was now embarking upon was something Wheelock would ask him to handle since, during my time there, the College had chosen different lawyers for specific purposes.

11. In addition, Attorney Hirsch was a social friend and had been a supportive ally to me in the face of President Jenkins-Scott's hostile behavior towards me, her escalating campaign of retaliation, and her repeated attempts to blame me for campus racial issues for which I was not responsible. When I asked him to protect me from her further abuse, he had agreed to help "behind the scenes." For example, he arranged that I would no longer lead the investigation of Drs. Gail Dines and Eric Silverman that President Jenkins-Scott had ordered, which I believed was retaliatory, based in anti-Semitism, and broke College rules on fair treatment of faculty. Based on many conversations with him, I knew Attorney Hirsch shared my concerns about President Jenkins-Scott generally, and about her treatment of Drs. Dines and Silverman. He had told me that he disagreed with the way President Jenkins-Scott was treating them and that he was not sure he could continue to represent the College with respect to them should it come to litigation because he had participated in strategy meetings with President Jenkins-Scott, the outside Kingston Bay consultant Dr. JoeJoe McManus, and others regarding the two professors. Since Attorney Hirsch had this view regarding the Dines and Silverman cases, I thought the same logic would most certainly apply in my case where he had actively participated in strategizing

with me about the hostile work environment I was experiencing and had acknowledged to me he thought I was being mistreated by President Jenkins-Scott. I thought, therefore, that he would never be Wheelock's lawyer against me.

12. Because of this background, I also thought that, should it come to this, I would call Attorney Hirsch as a witness to corroborate my views about my treatment at the hands of the Defendants.

13. These understandings about Attorney Hirsch informed my request to Dr. Olivarius that she write to the Chair of the Board of Trustees, Ms. Taylor, to inform her I had a new lawyer. I wanted Ms. Taylor to understand, unfiltered, that there was now a "new day" in my approach towards Wheelock: that I had decided to move toward litigation and intended to call Attorney Hirsch as a witness. I also wanted Ms. Taylor to identify the legal counsel with whom Dr. Olivarius should now engage on my case.

14. David Chard became the President of Wheelock College on July 1, 2016. As I believed that Wheelock was entering a new era with a new president at the helm, I truly thought that speaking directly with him could lead to resolution of the complaints that now form the substance of my lawsuit. President Chard and I entered into email correspondence to arrange such a meeting.

15. On August 11, 2016 he sent me an email which stated that "I am willing to meet with each of you [referring to myself, and Drs. Silverman and Dines] individually without any attorneys present, to explore possible resolution." Exhibit JG 1. As a result, I arranged to meet with President Chard at his office on Wheelock's Hawes campus on August 19, 2016.

16. The day before that meeting, President Chard sent me an email stating that he wanted it to be confidential: "I am acting under the assumption that our meeting will be held in confidence based on our earlier signed letter." Exhibit JG 2.

17. The "earlier signed letter" referred to a letter signed by both President Chard and me on July 29, 2016, which stated:

> We have agreed to discuss whether the dispute between you and Wheelock College (and former President Jenkins-Scott) may be amicably resolved. **We have also agreed that our conversations regarding a potential resolution shall be strictly confidential**, and that any statements made during our discussions shall not be admissible for any purpose in any related litigation. Exhibit JG 3. (Emphasis added.)

18. Wheelock had retracted several offers to mediate at the last minute, and this coupled with an already protracted and stressful dispute made me feel the August 19, 2016 meeting had very high stakes. To ensure that I could have a productive encounter with President Chard and would be able to communicate all the points I wished to make, I prepared extensively by reviewing documents and writing out my thoughts. I planned to be open and very direct with him about what I believed to be the strengths of my case, as well as the Silverman and Dines cases. Our agreement to keep things "strictly confidential" boosted my confidence about laying everything on the table.

19. The materials I reviewed included a document that detailed cases comparable to ours which was prepared by our attorneys McAllister Olivarius at the request of Gail Dines, Eric Silverman and myself, so that we could understand the risks of pursuing a federal lawsuit and what jury verdicts we might achieve if successful. That document was entitled "Jury Verdicts Informing An Analysis in Joan Gallos v. Jackie Jenkins-Scott, David Chard, Individually Named Trustees of Wheelock College and Wheelock College" (the "Jury Verdicts"). (Doc 25-7.) I took it to the meeting with me for my own reference, along with other materials.

20.     During the meeting, President Chard saw me reading the Jury Verdicts document and asked me if he could have a copy. I saw President Chard's request as a hopeful sign that this new president was beginning to understand the serious nature of the claims and the risk they posed to the College. I said, "Of course" and handed him the hard copy I had with me.

21.     At the end of the meeting, President Chard said that he would like an electronic copy of all the documents that I had brought to the meeting, including the Jury Verdicts. He explained that this would help him in his work with Wheelock's Board of Trustees. Especially given his previous assurance of confidentiality, I agreed to share these documents with him in an electronic form. On August 19, 2016 at 5:30 pm, shortly after I had returned to my office from the meeting, I sent all the documents that President Chard had wanted, including the typed notes I had used during our meeting, the Jury Verdicts, and a thank you note for the meeting. This was done in good faith, at President Chard's own request, and in the hope that I was genuinely helping him and Wheelock. Exhibit JG 4. In reply, President Chard thanked me for sharing this information with him. Exhibit JG 5.

22.     I alone made the decision to provide President Chard with the documents he requested. It felt right given the open and supportive nature of our meeting. Dr. Olivarius and her firm had nothing to do with it. I felt he had inherited a complex situation at the start of an already challenging new job. I believed that former President Jenkins-Scott, the Board, and possibly the College's lawyers had not been giving him the full story about our cases and was delighted he was curious about the details, which I was happy to provide during our discussion and by sending the materials he asked for. I felt sympathy for President Chard's position having stepped into a difficult administrative role at Wheelock myself.

23. I declare under the penalties of perjury on this 1st day of December 2016 that the foregoing is correct and true.

*[signature]*

DR. JOAN V. GALLOS

Commonwealth of Massachusetts
County of Norfolk

On this _1_ day of December, 20_16_, before me, the undersigned notary public, personally appeared Joan Gallos proved to me through satisfactory evidence of identification, which were ___MA DL___, to be the person who signed the preceding and attached documents in my presence, and who swore or affirmed to me that the contents of the document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

*[signature]*

Notary Public Signature

MACKENZIE LAMOUR
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES ON
JANUARY 27, 2023

## **CERTIFICATE OF SERVICE**

I, Anita S. Vadgama, hereby certify that the document was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing on December 2, 2016.

/s/ Anita Vadgama

Anita S. Vadgama